LEAR, Judge.
This matter is before the court on an appeal from an adverse judgment on a custody rule.
Mrs. Katie Lesage (defendant-in-rule herein), former wife of Mr. Francis W. Wing (petitioner-in-rule herein), received a divorce judgment on July 14, 1980, which judgment also granted her temporary custody of their minor son pending a hearing on a separate custody rule, which had been filed by Mr. Wing and which is the subject of this instant appeal. After a hearing, custody was awarded to Mrs. Lesage. The only issue is whether or not the trial court erred in deciding this rule for custody.
In well written reasons for judgment, the trial judge found (in part) as follows:
“Petitioner and defendant met while defendant worked as a waitress. They began a relationship, dated, and married in 1976. They lived in Assonet, Massachusetts. The child was born December 29, 1976. The petitioner and defendant separated June 29, 1978 when defendant returned to Baton Rouge with the child.
“Petitioner was not really sure what the status of his marriage was at that time although defendant told him she had returned to Baton Rouge to see a son by a previous marriage. A series of events began, including trips to and from Assonet which culminated in the final breakdown of the relationship and divorce.
“Defendant is presently married to Lawrence Lesage. Mr. Lesage is employed at Exxon earning $36,000.00 per year. His hours are 7 a. m. to 3:30 p. m. Defendant and Mr. Lesage have no extraordinary outstanding debts. They live in a three bedroom frame home on two acres in a country atmosphere near Greenwell Springs and Sullivan Roads.
“Defendant and Mr. Lesage plan to purchase a home in the same area built by Mr. Lesage’s grandfather. This five bedroom home will be renovated by Mr. Lesage. It rests on three and one-half acres one mile from their present home. A creek runs through the property.
“Mr. Lesage has attended St. Alphonsus Catholic Church for almost fifty years and since his marriage to defendant has attended regularly. Defendant is taking instructions in the Catholic faith and attends church now. The child attends Comite Baptist Church in a pre-school class three times per week from 9:00 a. m. to 2 p. m. Defendant transports him to school. The child will attend St. Alphonsus school in January, 1981 because he will be transferred from the Baptist to Catholic school. He also attends church services with his mother and Mr. Lesage.
“Although defendant worked to November 1979, she ceased working to be with her child because Mr. Lesage is earning sufficient funds to support the family. She testified that her duties are cooking, cleaning, washing, and caring for her son and husband. She spends $100.00 per week on food, prepares three (3) meals per day including Mr. Lesage’s work lunches. On weekends the family usually eats out. She believes there is no reason why she cannot care for her child.
“Mr. Lesage corroborates defendant’s testimony. He testified that the child is healthy, developing, and happy. He described his relationship with the child as ‘beautiful’ and close companionship.
“Petitioner himself has testified defendant was a good housekeeper, her house is clean, the child is well-developed, healthy, intelligent, and had all the appearances of being well cared for.
“The Lesage home has been described as spotless, in order, and neat by five witnesses. They have also described the child as happy, neat, appearing well cared for, well developed, and adjusted. One witness would allow her own children to stay in the Lesage household. Another described how the child works with Mr. Lesage on his tractor and with his cattle.
“Defendant is thirty-three years old. She did not graduate from high school but has obtained her GED.
*722 “Turning now to petitioner, he is age 39. He lives in Assonet which is forty-five miles from Boston and twenty-five miles from Cape Cod. He has an associate degree in Engineering, a B.S. in Industrial Technology, and part of a doctorate study in Business Administration from Northeastern College. He lives on 3.64 rural acres in a three bedroom home, actually located in Assonet Village with a population of 7000. He has been there sixteen years. Hilda Neal, petitioner’s mother, lives five miles away from Fall River, an exclusively residential area. He talks to her daily, sees her every third day. She mows his lawn, does dishes, is in good health, drives her own car, and lives with her sister. She knows the child well and use [sic] to care from [sic] him on weekends.
“If petitioner is awarded custody, he testified that his sixty-three year old mother who is retired plans to care for the child during the day while he works. If petitioner works at night, Mrs. Neal will have the child overnight. The child will be in the Christian Day Nursery, a private school one mile from Mrs. Neal’s home.
“Petitioner is in real estate. It requires much of his time and some odd hours. In the future, he intends to have employees to take care of late hour work to enable him to spend more time with the child. As the child gets older, petitioner would be able to take the child out when on business. Petitioner sees his five year old by a previous marriage on weekends.
“Petitioner jogs two (2) miles per day, participates in local politics, has served on the Assonet Board of Selectmen, Health, and Public Welfare, and as Police Commissioner.
“He used his degree in engineering working four (4) years at Raytheon as a manufacturing engineer in missile systems.
“His 1980 income through the third quarter was $15,000.00 to $20,000.00; as of May 30, 1980, he was in debt at least $40,000.00.
“Petitioner belongs to a church, has taught Sunday school, and believes in God.
“As has been stated, petitioner seeks a change of custody alleging defendant’s immorality, that is a ‘relationship with another adult male’, and marriage ‘all the while knowing full and well that she was still legally married to petitioner-in-rule, Francis W. Wing’. Further, petitioner alleges that defendant has failed to provide the child ‘with a proper and complete environment so that he may grow and develop as a human being’. Lastly, petitioner charges that defendant is ‘mentally and emotionally unstable so that the environment for raising said child is endangered, or made very difficult’.
“a) Immorality — a relationship with an adult male, and bigamy:
“From the testimony and deposition of petitioner (page 54 et seq.) it is obvious that petitioner relied on defendant’s marriage to Mr. Lesage apparently before the final divorce from petitioner. The Court is not convinced that defendant knowingly committed bigamy. She apparently was as confused as petitioner was when petitioner and defendant remarried after considering the possibility that his divorce from his previous wife may not have been effective. Further, there is no evidence to show any other immoral conduct sufficient to deprive her of custody.
“b) Failing to provide the child with a proper and complete environment:
“Petitioner admits that defendant has and can be an excellent mother. (Petitioner’s deposition, page 25, 26, and 57). Since defendant left him in June 1978, petitioner has learned very little of the relationship between defendant and the child; ‘All I know is what’s happened when I was with her.’ (deposition pages 25, 26, and 57). Further the testimony convinces the Court that the child has been well cared for and is presently in a stable, healthy environment.
“c) Defendant is mentally and emotionally unstable; the environment is endangered; made difficult:
“There is no doubt defendant has had a long history of emotional problems. But history is past, though it maybe [sic] a *723 mirror of the future. Is it in this case? The Court finds not.
“The evidence of defendant’s conduct since June 1978, belies a claim of continued emotional problems. True, she began her adult life under stresses which led to conduct not usually accepted by society as the norm. But we cannot say that change is not possible. Defendant’s recent conduct indicates change.
“On November 21, 1980, the deposition of R. Dean Coddington, M.D., was taken. Dr. Coddington, chief of child psychiatry at LSU Medical Center, New Orleans, Louisiana, found the child to be healthy, normal, well-adjusted, developing well in the last one and a half years, reaching a normal stage. (Coddington deposition, pages 9-11).
“Dr. Coddington found defendant to be honest with him. He found no clear sign of any pathology upon evaluating her current mental status. (Coddington deposition, pages 13-14). Dr. Coddington in addition to his interview with defendant and the child, had access to the depositions of petitioner and defendant. (Coddington deposition, pages 16-17). Dr. Coddington was ‘particularly concerned about her functioning as a mother, and.the stability of the family right now.’ (Coddington deposition, page 18). His findings: T found no reason to say that she is not at least an average mother ... I saw no reason that she would have to be re-hospitalized in a mental hospital in the foreseeable future.’ Dr. Coddington was looking particularly for anything indicating ‘situations that are likely to cause pathology in a child. Cause anxiety or depression in a child. I didn’t find that.’ (Coddington deposition, pages 18-19). Dr. Coddington found no reason to suggest that a change of custody was necessary or mandated. (Coddington deposition, page 10). Much of the examination of Dr. Coddington by petitioner’s counsel employed facts not proven at trial or based on uncorroborated and denied assertions of petitioner. The examination did not, for that reason, damage the conclusions of Dr. Cod-dington. Apparently, Dr. Coddington was surprised, after reading petitioner’s depositions, to find defendant healthy, (Codding-ton deposition, pages 73-75). In fact, under questioning from petitioner’s counsel, Dr. Coddington volunteered that he felt petitioner had problems, ‘seemed like he didn’t have his act together ... his mental functioning is somewhat disorganized’. This was Coddington’s feeling after reading petitioner’s deposition. (Coddington deposition, page 105). Dr. Coddington’s written report to petitioner’s counsel contains nothing contrary to his testimony. (Lesage 1 attached to Coddington deposition).
“It is noteworthy that apparently there is some misunderstanding between petitioner and his mother as to her future role with the child. Mrs. Neal expects the child to live with her and see petitioner when she takes the child to visit petitioner. (Neal deposition, page 19). ‘He will have him whenever he wants him’. (Neal deposition, page 31).
“In Bordelon v. Bordelon, 390 So.2d 1325 (La.1980), the Supreme Court states that:
“ ‘Thus, the best interest of the child, and not the possibility of harm, is the sole criterion applicable to change of custody cases.’
“Considering all of the factors which must be taken into consideration in deciding custody matters, and considering the evidence in this case, both favorable and unfavorable to each party, and applying the ‘best interest’ test as required by Bordelon cited supra, in the present time frame, the Court is of the opinion that custody should remain with defendant.”
This court must give great weight to factual determinations made by the trial court, not only because the trial judge is in a better position to evaluate the witnesses, but there must also be a proper allocation of functions between the respective courts. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Howard v. Howard, 339 So.2d 1275 (La.App. 1st 1976).
For the reasons stated by the trial court which we adopt, the judgment of the trial court is affirmed, appellant to pay all costs.
AFFIRMED.